May it please the Court, Hunter Klein representing the appellant in this case, United Neurology. In the time before the Court today, I'm going to argue in the first place that the Tri-Court erred when it failed to set aside the appraisal award because it exceeded the authority granted in the policy and was made outside of the grounds given in the policy. In this case, the appraisers determined that the plaintiff's award should be reduced, excuse me, the insured's award should be reduced due to a failure to mitigate. Did you put on any kind of specific evidence that supported your argument that they were mitigating, I mean they considered mitigating factors? Yes, Your Honor, we did. You had a floor here that you said was ruined by the hurricane and they said, well, the floor here was ruined by the hurricane and that you failed to put a tarp over the roof and consequently there's considerably less damage than might have otherwise been. Did you put any kind of evidence about specifics on there? There's no evidence as to the specifics of it. Well, how can the District Court rule on what was a mitigating factor and what was actually within its purview of determining the cause of the coverage, I mean the coverage? Two answers to that, Your Honor. In the first place, the relief that is sought is not that the Court determines what was mitigated and what was not. The relief that is sought is that the appraisal award is set aside for the very reason that mitigation was considered. And the evidence put on that mitigation was considered— Mitigation was considered with respect to what? I mean mitigation is a very tricky term when it comes to these appraisal reports too. I mean it's somewhere between mitigation and coverage that is a very hazy line it seems to me. There are two primary communications, Your Honor, that we rely upon to show what it is the appraisers were considering and the umpire was considering with regards to mitigation. Page 856 is umpire Garcia saying, These questions I have regarding largely the extent of damages to the property as a result of Ike versus lack of mitigation. There's also an email then from the appraiser O'Leary in this case who represented the policyholder, which is page 859. It says, My counterpart, speaking of the Hartford appraiser, is making a full court press to leave out significant amount of water damages, not because it was ensuing damage from the hurricane, but because the insurer failed to mitigate his damages properly. So the evidence as to carpet versus drywall versus tile, that's not in the record before the court. What is in the record before the court is the water damages to the interior. And to the extent that it was mitigated versus not, that's not clear. What do you mean mitigate? The argument the appraisers and the umpire was considering was that the plaintiff negligently, in this case, failed to take reasonable steps to mitigate the damages after the loss. Now, the problem with that is that the award does not indicate what they considered their. What's wrong with that? The issue with that, Your Honor, is that under the authority given by this court in TMM and in State Farm versus Johnson, the court determines that a reasonable degree of causal determination is relevant in determining preexisting condition versus things caused by the storm. The example in State Farm versus Johnson, if you have hail damage to a roof, you're not talking about remodeling the kitchen or leaky faucets. That's not the case here because a mitigation finding determines the negligence of a party after the loss. The mitigation instruction given by this court and by the other authority in Texas says that in order to support a finding of failure to mitigate or neglect under the policy, there must be several findings, one of which is liability under the claim, the second of which is negligence on the part of the policyholder. Nowhere in this contract does the appraisal clause allow the umpire and the appraiser to make a determination as to the liability for the claim, which is required for a failure to mitigate finding, nor does it give them the authority to determine the negligence of the policyholder, which also is required. If you don't point to any specific instances, how do we know it happened? We know it happened because the communication showing that's what they were considering and because the trial court in this case believed and assumed that. Is there any evidence that they were examining particular items with respect to mitigation or just generally asking questions that could be considered mitigation questions? What we know, Your Honor, is that they sat down and discussed with the property manager what steps were taken after the storm to mitigate. Now, we don't know and there's no record evidence as to specific things that were asked. Let me just pose a hypothetical to you. They might have asked the property manager, was the roof already leaking, right? They might have, Your Honor, yes. They might have asked the property manager, had a toilet backed up as a result of something happening, neglect during, I hate to use a loaded word, but something like that that would have resulted in a similar type of damage that was definitely not caused by either mitigation or the hurricane. That is possible. To me, that would be part of a prudent investigation. It's possible, Your Honor, but the reason that we think that this case is different is because, number one, there is no evidence that that was the questions that was asked. Number two, in order to support a finding of neglect, which is what these appraisers were considering, preexisting condition doesn't factor in. The language in the policy that says what neglect is under the policy, it's record. But the policy has covered the insurable loss, and if your roof was a Swiss cheese full of holes already, the insurable loss would be smaller than if it were a new roof, right? That's correct, and where the appraisers, too, have determined wear and tear, that would be exactly what that is going to. If the appraisers were to determine that it was not the storm that caused this roof, it was the aged and worn and torn condition of the roof, then that would be one thing, and that is what State Farm v. Johnson sort of addresses as that determination, but that is not what happened here. But, see, you don't know. I mean, you can't prove to us that that isn't what happened here, and you have the burden, don't you? Yes, Your Honor, we do. The evidence showing that they considered failure to mitigate comes from the umpire's own words and the ruling given by the trial court in this case where she said, specifically, in her denial of the motion to set aside the appraisal, the trial court held that appraisal panel acts within their authority when they determine whether damage was caused by a covered event or was a result of non-covered pre-existing condition like wear and tear, which is on point with TMM and on point with Johnson. Then she deviates from that authority when she says, as the second clause in that sentence, or in this case, neglect under the terms of the policy. Neglect under the terms of the policy requires the policyholder to do something after the loss. Are you referring to any specific item, though, that you suffered damage or just were treated unfairly by the appraisal with respect to any item that was examined or covered or not covered? With regard to item, Your Honor, I— You have to help me out on this because it seems to me you're trying to win a case on the basis of broad generalities, and I find that kind of difficult to get my head around. Therein lies the difficulty with the appraisal provision. When you're talking about items that are damaged after a storm, is the entire item, the walls and ceiling, which are themselves drywall, is the item the carpet? And the issue is, because of the— I don't care if she said so, but you tell me she didn't say that. She didn't even refer to particular walls or particular items or particular rooms or particularly anything. Because in this case, the appraisal award only gave a lump sum dollar amount for damages they believed to be covered based upon their determination that the plaintiff's failure to mitigate. And admittedly, the umpire and the appraiser did not say what specifically it was they failed to mitigate. All we know is that the trial court believed and applied the reasoning behind that they did fail to mitigate something. The appraisers and the umpire determined that they failed to mitigate whatever that was. She just gave—go ahead. Go ahead. She just gave one lump sum without itemizing any evaluation of specific damages? That's correct, Your Honor. She didn't say what she found with respect to anything other than I find this global total? That's correct. And that's comparable to the case in— Now, would you be under any obligation to put her on the witness stand whenever you were attacking the appraisal report to try to get her to be more specific? The opportunity was not given because the motion to set aside the appraisal award was not set for a hearing. It was just ruled upon. And in the jurisdiction— I mean, it's not atypical for these appraisal awards to be very brief, is it? It depends upon the language of the policy. Certain policies require the appraisal award to be itemized, and there actually is a Texas Court of Appeal— Well, you didn't have that. No, ma'am. This policy did not require itemization of the appraisal award. What it did require was appraisal of the amount of the loss, and what was not appraised was the amount of the loss because it was deducted by the plaintiff's supposed negligence, which is outside of the contract. That's purely your hypothesis, though. I mean, what you're quoting—I know this is a long district court opinion, and I'm sure I can't find it, but isn't that part of her general statement of principles? No, Your Honor. The quote that I gave was in her very last paragraph on the very final page under conclusions. Okay. It is where she says that—and it's the point where we believe that she deviated from Johnson and deviated from TMM—is that she equated neglect under the policy to a preexisting condition, which it is not. And the authority does not support that leap or does not support that determination. So what relief are you seeking here specifically, to set it aside and to have her reappraise it? The relief that we are seeking, Your Honor, is to have the decision of the trial court reversed as to setting aside the appraisal award so that it can be determined as to who is actually liable for this claim. The appraisal does one thing. It determines the amount of the loss. Here, they didn't even do that because they, on their own accord, reduced because of an affirmative defense under the policy. And so in this case, liability could not be determined by the court because in the first place the correct amount of the loss was never determined. So the relief that is being sought is to set aside the appraisal award because it exceeded its authority and it did not follow the terms of the policy. I'm going to turn the matter over to the district court to decide. Is that what you're saying? Yes, Your Honor. That is what we're asking for. Because in this case, the determination of negligence goes against the precedence of Johnson and goes against the precedence of TMM because the language in Johnson requires it to be an honest assessment of what the loss is. In this case, that was never done. But, of course, if it were set aside, I mean, $54,000, they were offering you zero. The appraisers offered you $78,000 approximately. And you're seeking a whole bunch of extra damage for lost business. Is that right or not? Yes, Your Honor. There was a claim being made for business interruption. And the issue with that is whether or not the investigation requirement under the policy puts the impetus on the policyholder to present or the insurance company to investigate as to what the requirements are. And the issue is the policy in this case requires notice of physical loss or physical damage to the property. It does not require notice be given on every potential coverage under the sun. That's not what the policy states. The policy states that the two notice requirements are the notice of actual physical damage, which was given. The error in that case was that the — or in this situation is that the insurance company failed to investigate the full extent of the loss, which is their duty under the policy, not the policyholders. The authority in this case that is determined, for example, the Metro case, the Metro hospitality case, that was a scenario where the chillers in the AC units malfunctioned. And so the claim was filed and then later— But did the appraisal — was the appraisal designed to embody that or not? No, Your Honor. The appraisal in this case was designed to embody the physical loss to the structure. Tell me all of the evidence, just if you can, just to summarize the evidence that you're relying upon to say that the estimate or the evaluation of the property loss here was based upon a failure to mitigate. The evidence we have before the court is the email from the umpire to the appraisers saying that she has questions about the damages caused by Ike versus failure to mitigate. Then the declaration of the policyholders' appraiser, Louis O'Leary, saying that they are discussing the failure to mitigate versus damages caused by the storm. And then finally, the declarant by Manny Faheed, who was the property manager, who was questioned for 45 minutes solely—not solely about, but in large part about what steps he took to mitigate the damages after the loss. That is the evidence upon which we presented to the court, which she accepted when she ruled that the appraiser was not—the appraisal was not default because they factored in neglect to the policyholder. The fact that he was—I sort of go back to this again—the fact that he was questioned about this doesn't prove much about whether they actually factored appraisal into the award, does it? I mean, you don't know. Was he asked, well, how much of that dripping occurred after the storm, or how much do you think it exacerbated—how much do you think it cost extra after—because of what occurred after the storm? No, Your Honor. We do not know the answer. You don't have—and no affidavit by him about the questioning he was exposed to or whatever? There is an affidavit as to the questioning he was exposed to, but not the specific questions he was asked. His affidavit states generally that I was asked about what steps we took to repair the property after the loss, but there is no affidavit saying specific questions that he was asked. But again, the trial court in this case based her determination upon— Wouldn't they really have to know that to know what sort of damage that had occurred—that occurred that was actually covered, would they not? I'm sorry, Your Honor? In other words, to know what have you done to this since the storm would be irrelevant and a pertinent question to determine actually what damage did the storm cause. Your Honor, in that case, in this situation, we would disagree because the determination as to what occurred after the loss is not within the scope of what the appraisers are supposed to be considering. I understand that, but if he comes into a room that looks like it's completely redone and looks like it suffered no loss, you ask, well, what did this look like at the time of the storm? And how much have you done to this since then? I mean, to get some kind of idea about what kind of loss has occurred. I mean, I just—it's a very hazy line to me. Your Honor, I see I'm out of time. May I answer your question? Sure. Okay. The issue is that when appraisers come in and in your situation say what did it look like before the storm, that is within their authority to do so. But in asking what have you done after the storm, that does not affect the amount of loss that they have suffered. That's a question as to liability for those damages. And in this situation where an appraiser asks a— I understand that. I mean, it's also—I agree with you. I mean, it could easily be considered a question of liability, but it's also a very relevant, pertinent, even necessary question for the appraiser to make a determination of the damage that occurred. There are many, many things in this case that she could have done differently, and I'd like to see her answer that question.      Your Honor, I do not have the right to use the word for the covered object. Yes, Your Honor. Okay. Thank you, sir. Thank you. Yes, sir. Thank you, Mr. Kline. Mr. Green, we'll hear from you. I'm with Mr. Sadler. I'm Mr. Green. I'm going to use rebuttal. Oh, you're on rebuttal. I'm sorry. I see. Mr. Sadler? May it please the Court, I'm Marty Sadler. I represent the appellee, Hartford, in this case. We're here before this Court on an appeal from two specific rulings by the District Court. The first is the ruling on the motion to set aside the appraisal, and the second is the summary judgment ruling, and that's an important point because subsequent to the time of our briefing, I went back and looked at what the Court is supposed to do in terms of review of those two decisions, and I find the Michaels Court, the Fifth Circuit in 2013, addressed the motion to set aside an appraisal award on an abusive discretion standard, and I should lose a point on my brief for not having that cited there, but I think that you look first in this instance at the first decision, which is to deny the motion to set aside the appraisal, and then you look at the summary judgment motion with the appraisal decision already made. And Texas law, of course, favors appraisal, and every presumption is weighed in favor of the appraisal award. The appellants, of course, cite the Wells case for a proposition that this presumption in favor of appraisals has to yield to the degree its application conflicts with the presumptions required to be made in favor of the nonmovement in a summary judgment case. And Wells was a summary judgment case where the appraisal award was considered as part and parcel of that summary judgment matter. That's not the situation we have here, so we don't have to restrict the presumptions in favor of appraisal in this case because it's a separate determination by the trial court. And the facts here are exactly consistent with Johnson and Lundstrom and TMM Investments. Tell me why I'm off base here. There's a motion to set aside the appraisal report. Is that correct? That's correct. At that point, what precludes the party who is challenging the appraisal report to ask for a hearing and to ask for examination and cross-examination of the appraisal panel? There is absolutely nothing that prohibits that. In fact, the case of MLCSV 10 versus Stateside Enterprises, if you look to that case, you'll see that there were depositions of both of the appraisers and the umpire, and all of that evidence is considered in the context of the decision with respect to the appraisal. That could have occurred here. But no one asked for a breakdown or itemization of the actual award. No one asked for testimony or even an interview with any of the appraisal panel. So there's none of that evidence here. And, in fact, that's really the lick log is that there's no evidence here at all that when you look at the award, that award is actually colored by consideration of mitigation issues. In fact, in this case, there's plenty of evidence prior to the time that the appraisal was taking place that there are other causes that were going on at these two buildings. You have three reports from Reed, Jones, McCorry, and Williams, and you have a report from Hague Engineering which identified pre-existing conditions, other causes, and minimal hurricane damage. And so those are all things that could inform the umpire's award in this case, that appellants simply act like that didn't happen or it's not available here. And, in fact, when we talk about this causation question, I think the courts have pretty much gotten to the point where they recognize that certain elements of causation are always going to come up in the course of an appraisal panel process. And the Lundstrom Court and the Johnson Court both talk about whether the causation you're looking at goes to valuation or goes to liability. And when you're talking about other causes, this particular case has photographic evidence, has investigation work done within four or five months of the storm, and then it's not until the two-year anniversary of the storm that the lawsuit is brought. And it's right after that that we invoke the appraisal provision, Hartford does, and you have a clear picture of what the properties were like before and after. The pictures are not in the record, just the written reports of those two entities. Here, of course, the face of the award is silent as to what went into the award. The award itself says, we do hereby award, as the amount of loss, the following. And then, as we mentioned before, there's been no request for itemization or discussion to get behind what's... That's a huge difference here. I mean, you have a three-person panel, correct? Correct. And each of the parties appoints one member of the panel? Correct. And then do the two members of the panel choose the chairman of the panel? They choose the umpire, yes. They choose the umpire. And you have one on the one hand, 800,000, and on the other hand, you have 57,000, 78,000. Correct. In fact, the appraiser for Hartford argued that there was no damage caused by the hurricane. And the award comes out in between those numbers. It happens to be a lot closer to the lower number. The 800 is for business loss, right? Actually, there are two buildings. They have an 800,000-dollar building loss on one and about 100,000 or so on the other. And then there's the separate question of the business income. And there are two business income claims because there are two appellants. The business income was covered under the policy. It is covered under the policy. And the first time that the appellants raised the issue of a business income claim is on behalf of Atari Real Estate at the time of the mediation back in October. That's when that starts. That's when Hartford filed a motion for summary judgment on Atari's interest in the insurance proceeds. So that was held in abeyance until after all the appraisal went forward and all that kind of thing. But that was the first argument. The second business income claim is United Neurology's business income claim. They say that they suffered about a 10-day break in service following the storm. And they asserted that claim for the first time in an expert report which was submitted in March of 2013. 2011, I'm sorry, 2011. And it's just in there with no supporting evidence. During the appraisal process, some documents were produced by the appellants through their appraiser that sort of went back behind United Neurology's business income claim. Our appraiser sent them to me. We sent it to a forensic accountant who was unable to determine from those documents whether there was, in fact, a business income loss incurred by United Neurology. And on top of all of that, United Neurology never pled in the pleadings a business income claim. They have general allegations of all the damages available to us, but they never mentioned business income at any point in time. And so the trial court in this case made really two determinations. The first determination she made was that the delay of more than two years in introducing the United Neurology claim was too long as a matter of law and that it was prejudicial to the insurance company. And then she also ruled that there's no pleading to support a business income claim anyway. So now at this late date, that claim is barred.  I think you just referred to this, but refresh me on how much of the $800,000 is loss of business income? I recall the Atari claim being $500,000 or so and the United Neurology claim being like $50,000 or so. I don't think we have $800,000 in business income. I think that's just the second building. So how much in business income? About $500,000 for Atari in their real estate business, loss of rental income, and about $50,000 from the United Neurology for interruption in their clinical practice. We also need to address the prompt pay issue. Appellants have raised this issue that in spite of the fact that the appraisal award was paid in a timely fashion, that they should be entitled to prompt pay penalties under the Texas Insurance Code. They rely on a single case out of the Northern District of Texas. That's the Graber case. And in that case, the court denied summary judgment to State Farm, even though they had paid the appraisal award in a timely manner. And it's sort of twisted reasoning, but the court there goes back to the Breshears case to say that Breshears didn't actually say that when you pay the appraisal award in a timely fashion, you cannot have prompt pay penalties. Breshears didn't say that, but other courts have said that in other contexts. What Breshears said was, first, they timely paid the appraisal award within 60 days of the award, and then addressed the prompt pay claim issue with respect to the original adjustment of the claim. And so on the original adjustment of the claim, they say that all of that was timely, and then they say the fact that the appraisal award was issued much later is immaterial. So they don't explicitly say that that means you don't get a prompt pay award, but they say it's immaterial in that court. The Scalise Court, Southern District of Texas, out of McAllen, make that point explicit. And that's where they say that relevant authority directs that an insurer commits no prompt pay violation when it submits the delay inherent to the delay inherent in the contractual appraisal process, before paying all the covered damages determined by that process. So that's the case that we have here, is a situation where there was a complaint about the original adjustment first made in the lawsuit filed two years after the storm. Appraisal was invoked in that same month, and the appraisal award finally comes out in 2000, I want to say, 13, maybe 2012, 2011. But anyway, the appraisal award finally comes out, and Hartford immediately pays that award. So if you look to Scalise, and if you look to Brashears, and if you look to all of the other cases, Russell v. Scottsdale, Kibitow, In re, Slavonic, Mutual, Medistar, 12 Oaks, Partners, they all say that in that situation, the insurer is not liable under the prompt pay statute. The Graber Court also looks at the Higginbotham case, which is a Fifth Circuit case, which first established the notion that there's no escaping the prompt pay claim if you, the prompt pay damages if you underpay a claim. And that's later been codified in the insurance code. But we don't have a situation where we failed to properly pay the claim based on the information available. And Higginbotham, the critical, the crux of Higginbotham is a finding of liability. We don't have a finding of liability here, and we will never have a finding of liability because the appraisal award has been validated by the district court, and it was a timely payment of the appraisal award. I think the last argument that needs to be addressed is whether Atari Real Estate can claim a business income loss under this policy. Atari is not a named insured, and they are not a third-party beneficiary. I think the court addressed this pretty well, but to qualify as a creditor beneficiary, the maker of the contract, that would be Hartford and United Neurology, must have intended to confer a benefit on the third-party and intended for the third-party to have the right to enforce the contract. That's an in-ray material science case out of the Houston First District, 2007. The contract has to either expressly name the third-party or express that the third-party has the right to enforce the obligation. None of that's evident in this case. The intention to confer benefits on the third-party must be clearly and fully spelled out, or enforcement by the third-party must be denied. That's the MCI telecommunications case, and in that case, the court even says that if the issue comes up in a summary judgment, you still have a presumption against a third-party beneficiary status because it's the other people who made the contract. The Todd's case and the Richmond Capital Partners case also say that point. Now, Atari, it's clear under the record that Atari contracted with United Neurology to obtain insurance for the buildings, but there's no evidence in the record that Atari contracted with United Neurology to obtain insurance for its real estate practice. And that's the only thing they're trying to claim back here because the building was claimed. It turns out that Atari owns the buildings, not United Neurology, but it's immaterial because the building claims were paid. And there's no showing anywhere of an intent to confer third-party status. Appellants also try to bring up a DTPA claim, and they rely on a case that says that you can acquire, you can seek to acquire insurance through contracts with other parties or other types of goods or services. But in this instance, Atari is really only looking for insurance benefits, not insurance coverage, as I can tell. What happened to all those claims in the district court level? I mean did it specifically address these claims that you're referring to now, the DTPA claim? The district court decision, she addresses the DTPA claims, I think, in the conclusion statement. She does not mention the DTPA claims, but she addresses the fact that there's nothing in the record that puts a third-party beneficiary status on. She granted judgment dismissing all the claims in effect. That's correct. In fact, the court wasn't sure at the end of the summary judgment proceeding whether all of the claims of all of the parties had been addressed in the summary judgment motion. And so she asked the parties to file something if there's something left out. And we filed an agreed notice that everything had been addressed in the summary judgment motion, and she then issued a final judgment. Okay. Is that about covering it? I believe that covers it. Okay. Mr. Sadler, thank you, sir. Mr. Green, we'll hear from you. May I please support Bob Green for neurology? The evidence that we have that the appraisal considered negligence, which is not any part of the appraisal clause, there's no case that ever says appraisers can decide fault of the party. But that evidence is in the form of the e-mails where the umpire outlines the plan for the appraisal. And in that, she says that, look, here's a consideration. Ike damage versus failure to mitigate. The appraiser who was appointed by the policyholder says to her in an e-mail, and this is part of the record, look, we're not supposed to do that. That's an affirmative defense under the policy. But if you're going to do that, let's make sure that we make, in the award, we outline that so the trial court can make that determination and cut those apart. But the appraiser did not do that. I, as trial counsel for the insurance company, wrote Mr. Sadler and said, look, this is what they're trying to do. Why don't we agree to have a joint letter to at least request that they outline those damages so after the fact, we can tell and have those arguments with the court. Mr. Sadler wrote back and said, no, we shouldn't interfere with the process. If you have a problem with it afterwards, then you just move to the other side. And so that's where we were. And we filed a motion then to set aside the appraisal award, and they raised some issues in their response as to hearsay. I don't think that is a problem at all because it shows she outlined, the umpire outlined what her plan of action was. So it would be admissible under 3033 because it's her state of mind. In response, however, to the raising of that issue, in our response, I pointed out, look, there are some cases, there are some courts that say you shouldn't depose appraisers. And I cited the case. I don't have it right here, and I apologize for that on my fingertips, because it puts a chill on the process. It's going to be harder to get people to do that if they're subject to cross-examination. I've never seen a case. Maybe it happens. I don't do a lot of arbitration, but certainly I've never seen a bunch of depositions taken by arbitrators. So that's the position that we were in, and that's why we presented the case the way we did. We didn't think it made any difference because the trial judge— Now that it's covered, do you have an opportunity to go in and to speak at that time to the appraisers and make your case? No, Your Honor. No, it's not an adversarial— Is that precluded, or is it—in other words, what if you requested—I would like to have a moment with the appraisal panel. It's certainly precluded by custom, as Mr. Salazar wrote me back. No, we've got to stay out of the process. All I want to do is send a letter. You don't impress me as a lawyer that's going to be intimidated into a position simply because another lawyer told you to do something. No, Your Honor, but I do respect the process of appraisal, and the custom in appraisal—in some jurisdictions, it is changing. But the custom, and certainly in Texas, in an appraisal, you let the appraisers go do their thing. You're not supposed to do anything. They're supposed to be unbiased. You're not supposed to do anything to interfere with that process. And you've got an appraiser— You said you shouldn't have ex-party contact with them, but I don't—I have no idea about that. I have never—I have never seen an appraisal, Your Honor, in Texas where the lawyer showed up and—I'm sorry. If you get the feeling somebody's going to put the screws through you, I don't think you have to just sit by idly, do you? Well, I mean, you know, we did what we thought we should do. Maybe I wasn't aggressive enough, and I should have started noticing depositions, but I've never seen that done before. Let's move over to the merits of that issue because it still boils down to they have several reports, as I recall, that talk about the preexisting condition of the building and that the hurricane really didn't touch. This is right down near where Brennan's is in Houston, right? It's on 59, Judge. It's inside the loop. Right, inside the loop. Not far from Brennan's. Yeah, but I know that the amount of damage in that area varied pretty widely, so it's not implausible to me that maybe there was minimal damage from the hurricane, as one of the reports said. My point is that if there's that evidence on one side, that the appraisers had that, and all you've got is this property manager saying he was talked to for forty-five minutes, you bear a heavy burden. How do you overcome your burden? We do have more than that, Judge. We have the email from the umpire to the appraiser saying, this is what we're going to do, here is my issue. And her issue was I versus failure to mitigate. There's no record before this court that the appraiser or the umpire at any time raised the issue anything but mitigation. Well, but that cuts the other way, too, doesn't it? Because after that email was sent, the umpire could have said, oh, yeah, you're right, we won't consider that after all. But she didn't. Well, you don't know that. Well, they did not offer any contrary emails or contrary evidence to the motion. Okay, Mr. Green, I think we have your case in hand, and thank you for your argument. Thank you, Your Honor. We'll call the next case of the day, and that's Pershing versus Thomas Keebock.